PIZZUTO, J.T.C.
Separate complaints have been filed by taxpayer Chesapeake Hotel LP and taxing district Saddle Brook Township contesting the 1999 property tax assessment of taxpayer’s 12-story, 221-room hotel located within the taxing district on Pehle Avenue near the intersection of Interstate Highway 80 and the Garden State Parkway. The property is designated as Block 1003, Lot 1, in the Township’s tax records. During the tax year at issue, the hotel was known as the Saddle Brook Marriott. The property was assessed at $15,000,000, of which $2,717,000 was allocated to land and $12,283,000 to improvements. For a period including the subject tax year plaintiff, the owner of the real property, contracts ed with Marriott Corporation to manage and operate the hotel. Plaintiffs income from the property consisted of the net operating income of the hotel after the payment of various fees to Marriott under the management and operating agreement.
The income that the property owner received is not income from the rental of the real estate, but rather the net income of a business conducted at the facility. Therefore, valuation of the fee simple interest in the real property by capitalization of income is a more complicated exercise than it is in cases where there is a lease *527 of real estate to the operator of a business. It requires the separation of the income attributable to the use of the realty out of the total income generated by the operation of the business before capitalization of the realty income. This process is generally treated in the discussions of going concern value and business enterprise value in The Appraisal Institute, The Appraisal of Real Estate, 27-28, 641-644 (12th ed.2001). The treatise notes that income is derived from the total assets of the business (TAB) which can include real property, tangible personalty, and intangible elements. It concludes:
In the income capitalization approach, because the capitalized income stream will most likely reflect income to TAB, all components of net operating income not attributable to the real estate must be removed. I Id. 643].
Although the treatise identifies hotel operation as a business presenting this pattern, it does not discuss particular methods for the determination of realty income, either for hotel operations or generally.
The employment of the income approach to appraise hotel property and the question of the identification of income not attributable to real property and its extraction from total income were the subject of Judge Crabtree’s opinion in Glenpointe Assocs. v. Teaneck, 10 N.J. Tax 380 (Tax 1989), aff'd 12 N.J. Tax 118 (App.Div.1990). In Glenpointe, the court accepted the conclusions of an expert appraisal witness, Stephen Rushmore, concerning the particular adjustments that are necessary to extract non-realty income from total income so as to compute the income to be capitalized into real estate value. Rushmore is the author of Hotels, Motels, and Restaurants: Valuations and Market Studies (1983). He has established a national reputation in hotel valuation, and the procedure he employed is often described as the Rushmore method.
Rushmore considered that all payments to the entity that manages and operates the hotel constitute business income generated by the exercise of management and entrepreneurship. Accordingly, he excluded these payments in the computation of realty income subject to capitalization. In addition, Rushmore considered that a portion of the overall income was realized by the *528 employment of furniture, fixtures, and equipment (often referred to as “FF & E”). Since these items are (generally speaking) personal property rather than real estate, the income attributable to them, under Rushmore’s method, is also excluded from realty income. Separate adjustments are made to provide for the periodic replacement of the personal property (the return of FF & E) and also for a yield on the investment in personal property (the return on FF & E). This method has been employed by experts in other hotel valuation eases and followed in reported decisions in New Jersey and other jurisdictions. Prudential Ins. Co. v. Parsippany-Troy Hills Tp., 16 N.J. Tax 58 (Tax 1995), aff'd 16 N.J. Tax 148 (App.Div.1996); Westmount Plaza v. Parsippany Troy Hills Tp., 11 N.J. Tax 127 (Tax 1990). See also Marriott Corp. v. Bd. of County Comm’rs of Johnson County, 25 Kan.App.2d 840, 972 P.2d 798 (1999) (collecting cases).
The task of extracting real estate value from total asset value has attracted considerable attention in appraisal literature and practice. The expert who testified in taxpayer’s case in this matter, David C. Lennhoff, is the editor of a collection of articles entitled A Business Valuation Anthology (Appraisal Institute, 2001), and is one of the developers of Appraisal Institute Course 800: “Separating Real And Personal Property from Intangible Business Assets”. Applying the theories he has developed to hotel valuation, Lennhoff concludes that, in addition to the adjustments of the Rushmore method, several additional adjustments must be made to arrive at an accurate valuation for the real property used in a hotel operation. Lennhoff has given expert appraisal testimony in hotel valuation matters before tax tribunals in several states, and taxpayer in this action has pointed to decisions of the Arizona Tax Court, the Tennessee State Board of Equalization, and the Circuit Court of Loudoun County, Virginia, in which Lennhoffs approach and value conclusions were accepted. See, e.g., WXIII/Oxford-DTC Real Estate, L.L.C. v. Loudoun County Bd. of Supervisors, 64 Va. Cir. 317, 2004 WL 2848543, 2004 Va. Cir. LEXIS 157 (Loudoun County 2004).
The additional adjustments that Lennhoff proposes in this case are designed to deal with value attributable to: (a) personal *529 property; (b) the hotel franchise or “flag” (in this case the Marriott affiliation); (c) various residual intangibles, including goodwill and business and credit relationships; and (d) developmental and start-up outlays associated with the initiation of the hotel business.
In regard to personal property, Lennhoff makes the deductions from operating revenue provided in the Rushmore method both for a replacement allowance for FF & E and for an investment return on the depreciated cost of FF & E. In the case of the subject, his replacement allowance is 5% of gross income ($610,-583), and his investment return is 9.5% of original cost depreciated by 60% ($143,606). He considers these adjustments to reflect operating conditions and to provide for replacement of FF & E, but does not consider that they serve to exclude the value of personal property from the capitalization of income after all the deductions he allows. In addition to those deductions, Lennhoff considers that it is necessary to subtract the depreciated cost of FF & E ($1,511,649) from the amount arrived at after capitalization [adjustment (a) ] in order to exclude the value of personalty actually in use on the valuation date from the result of capitalization.
Taxpayer’s appraiser also considers that the subject hotel realizes “revenues that consistently exceed comparable hotel business operations conducted at similar real estate.” He considers the excess revenue to be earned not by the real property but by the Marriott flag. On the basis of nationwide industry surveys, differences in income following reflagging of hotels and comparison of the subject with a “competitive set” of hotels in the vicinity, the appraiser makes two alternative calculations to address the value of the Marriott flag. His first alternative is a deduction of 4.35% of gross revenue ($531,207) to extract the value of both the flag [adjustment (b) ] and the residual intangibles [adjustment (c) ]. The second alternative entails a deduction of 15% of net income from operations before return on FF & E and amortization of start-up costs ($337,788) to adjust for flag value [adjustment (b)'] with residual intangibles [adjustment (c) ] dealt with by a 75 basis-point adjustment in the capitalization rate.
*530 Lennhoff derives his start-up cost figure of $3,189,140 (approximately $14,430/room) from current Marriott franchising documents. He considers that it is necessary to make allowances from hotel revenues for both return of and return on this amount. He does so by deduction of $337,919 [adjustment (d) ] to amortize the amount at 9.5% over 25 years.
In addition to income analyses utilizing the actual experience of the subject with the alternative methods of dealing with adjustments (b) and (e), Lennhoff also performed an income analysis utilizing data from the competitive set of hotels so as to derive a market-typical value. The subject-specific conclusions were $10,000,000 and $9,100,000, while the market-typical conclusion was $7,200,000. Emphasing the subject-specific data, Lennhoff concluded a final value for real estate of $9,500,000.
The taxing district’s appraiser, Robert McNerney, employed the original Rushmore methodology and analyzed principally income and expense data specific to the subject. He allowed a deduction of 3.5% of gross revenue for management fee and another 3.5% of gross revenue for franchise fee. This compares to Lennhoffs allowance of slightly more than 4.9% of gross income for management (a base management fee of 3% plus a fraction of profit over a minimum) under the actual arrangement that is described as including a flag. Lennhoff also appears to posit an alternative allowance of 7.9% of gross revenue consisting of a 3% management fee and a franchise fee calculated at 6% of room revenue and 3% of food and beverage revenue. McNerney’s 7% total is therefore much closer to Lennhoffs alternative than the lower rate Lenn-hoff actually used. The actual amounts are $601,830 for Lennhoff and $810,630 for McNerney. McNerney also allowed 2% of gross revenue or $231,608 for replacement or return of FF & E and $165,750 for return on FF & E. The corresponding amounts in Lennhoffs analysis were respectively $610,583 and $143,606. McNemey’s value conclusion was $16,150,000. A comparative table of the income capitalization calculations of the appraisers is set out as an appendix to this decision.
*531 Alter McNemey’s testimony was presented, the trial was interrupted in order for the taxing district, with consent of taxpayer, to determine whether Rushmore would appear as an expert for the taxing district to give his opinion as to Lennhoffs additional adjustments. Rushmore did appear, and although he did not prepare an appraisal of the subject property, he addressed three issues: (1) the calculation of the flag value; (2) the necessity for a separate deduction from capitalized income of the value of FF & E in addition to the expense allowances for return of and return on FF & E; and (3) the appropriateness of the amortization of start-up costs.
Rushmore’s analysis did not address itself directly to the existence in theory of additional earning capacity in a franchise identity or flag. Rather, he addressed Lennhoffs quantification of that capacity at 15% of revenue before certain deductions in the case of the subject. He appeared to consider that Lennhoffs conclusion rested fundamentally on a comparison of the subject’s performance with the performance of the hotels in the competitive set of hotels in the vicinity. These were the Holiday Inn and Howard Johnson facilities in Saddle Brook, the Crowne Plaza in Hasbrouck Heights and the Ramada in Rochelle Park. Rushmore did not consider the hotels in the competitive set to be comparable to the subject in physical condition and amenities provided and therefore concluded that the 15% adjustment was not justified.
With respect to the FF & E question, Rushmore was emphatic that a deduction from capitalized income is not necessary to remove FF & E from final value. He did not take issue with Lennhoffs description of the operating deduction for a return of FF & E as providing for replacement rather than exclusion of the item. He insisted, however, that allowance of the return on the depreciated value of the FF & E in place not only removes the earnings attributable to that property from the capitalized income stream, but also removes the property from the value arrived at by capitalization. He reasoned that either the allowance of return on FT & E or subtraction of FF & E value after capitalization of income without this allowance will remove FF & E from value. *532 To make both adjustments, he concludes, double counts (i.e. makes the deduction twice).
Rushmore also considered that the amortization of start-up costs was unnecessary to remove non-realty elements from value. In part this conclusion rests on his characterization of start-up costs as essentially consisting of ongoing and repetitive expenses for training, management and inventory, whose recurrence is provided for in ordinary operating expenses. In addition, he did not believe that recovery of historical start-up costs would be appropriate for a hotel, like the subject, which has been in operation since 1966.
It remains to determine whether a value has been demonstrated for the subject property that warrants a change in its assessment. Value, of course, is a question of fact. Ochsner v. Cranbury Tp., 8 N.J. Tax 830, 333 (App.Div.1986). Valuation of commercial real property is a factual question of such technicality as to require expert testimony. See Jacobitti v. Jacobitti, 263 N.J.Super. 608, 613-614, 623 A.2d 794 (App.Div.1993), aff'd, 135 N.J. 571, 641 A.2d 535 (1994). In evaluating expert testimony as to value, the court functions as the trier of fact and accepts or rejects given conclusions of an expert in whole or in part based on the cogency of the expert’s reasoning and the empirical support the expert can adduce for opinions asserted. Coastal Eagle Point Oil Co. v. West Deptford Tp., 13 N.J. Tax 242, 299-300 (Tax 1993) aff'd, 15 N.J. Tax 190 (App.Div.), certif. denied, 143 N.J. 320, 670 A.2d 1061 (1995).
In the present case, the adjustments proposed by Lennhoff to the Rushmore method have both theoretical and empirical aspects. In other words, they are made for stated reasons, and they rest on particular data. In order for any adjustment to have persuasive force in a factual finding of value, it should rest on cogent reasoning and be founded on reliable data. Lennhoffs proposed adjustments, on the whole, are not persuasive either for theoretical or empirical reasons.
The adjustment for flag value has both theoretical and empirical difficulties. In theory, the question seems to be whether the flag *533 may carry with it such superiority of management skill and reputation with consumers as to produce an above-market return from the property. Yet actual experience at the subject usually is the best measure of the market. See Equitable Life Assurance Soc’y v. Secaucus, 16 N.J. Tax 463, 466 (App.Div.1996). Moreover, especially in the case of properties sensitive to many intrinsic and extrinsic factors like hotels, there may be a wide range of results that can be achieved at competent levels of management. Differences in result do not necessarily require a conclusion that management is either superior or inferior. A final theoretical point is that superior management, if present, presumably commands a premium in the franchise and management fees charged to the property owner. Since both Rushmore and Lennhoff exclude all franchise and management fees from net operating income to be capitalized, the management differential is, to a significant extent, self-adjusting.
In the present case, however, the greater difficulties are empirical and go to the calculation of Lennhoff s percentage deductions from income to quantify the value of both the flag and residual intangibles. Rushmore’s observation that the competitive set of hotels in the vicinity is not comparable is sensible. The remaining data used by Lennhoff is not reflective of market conditions in this locality. In these circumstances, the deductions from income for flag value and residual intangibles are not accepted.
Similarly, the start-up cost adjustment may have some theoretical soundness where the hotel business is actually still benefiting from start-up costs, and the costs can be specifically identified and limited to those that produce business value as opposed to real estate value. In the present case, however, empirical considerations do not support the adjustment. Lennhoff proposes a 25-year amortization of start-up costs for a business already more than 30 years old on the valuation date, and the cost estimate is derived from data having no relation to the subject. This adjustment also is not accepted.
Lennhoff s proposed deduction from capitalized value to extract FF & E from real estate value is not justified at the theoretical *534 level. Once an appropriate allowance of income earned on the FF & E is deducted from the income stream to be capitalized, that property is no longer in the capitalized value. There may be differences of opinion over the rate of return appropriate on capital invested in FF & E or over the extent of depreciation, but to allow a deduction for a return on FF & E from income as well as a deduction of the invested capital from value is, as Rushmore concludes, to double count.
As an alternative means of accounting for the business value of residual intangibles other than the flag, Lennhoff added 75 basis-points to the capitalization rate he considered appropriate for conventional real estate. His total rate, before addition of the effective tax rate, was .1025. Although LennhofPs adjustment to the capitalization rate was specifically intended to deal with business intangibles, his general analysis of the peculiarities of hotel operation supports the recognition of a differentiated capitalization rate for hotel property. In appraisal practice, the capitalization rate is understood to reflect the investor’s opinion of the quality, quantity and durability of the income stream produced by the property. The Appraisal of Real Estate, supra, at 494-495. In the instance of hotel property, differentiation may be considered to reflect both the susceptibility of the income stream to the vicissitudes of short-term occupancy in variable circumstances and the maintenance of various intangible assets to manage those vicissitudes. Accordingly, a higher capitalization rate for hotel property, as opposed to investment property offered for long-term lease, appears reasonable.
When Lennhoff s value calculations are revised to eliminate his flag, residual intangibles and start-up deductions from income, the net income to be capitalized becomes $2,108,314. Capitalizing this amount at the .1166 rate Lennhoff employs, including the effective tax rate, but without his proposed 75 basis-point adjustment, produces a value of $18,081,595. If the 75 basis-point adjustment is made, the rate becomes .1241 and the value becomes $16,988,831. These values also disregard LennhofPs subtraction from capitalized value for personal property. McNerney’s final value conclusion is $16,146,074, produced by capitalization of net *535 income of $1,834,194 at a rate of .1136. The derivation of these figures is also shown in the Appendix.
The property’s assessment for the subject tax year is $15,000,000. The average ratio calculated for the taxing district for that year under N.J.S.A. 54:51A-6 (“Chapter 123”) is .9873, and the lower limit of the common level range is .8392. McNemey’s value, as well as the values derived at both a standard and a differentiated capitalization rate from Lennhoffs data (without the deductions from income he made for flag, intangibles and start-up costs), all exceed the amount of the property’s assessment. All these values produce assessment ratios below 1.0, and under Chapter 123 no reduction in the assessment is warranted. Only the highest value (derived from Lennhoffs data at an undifferentiated rate) produces a ratio that falls below the lower limit and would therefore suggest an increase in the assessment.
In the final analysis, however, the property’s assessment is considered to fall within the common level range. McNerney’s base capitalization rate, reflecting his opinion of the general real estate market before inclusion of the effective tax rate component, is .092. Lennhoffs comparable rate, before his 75 basis-point adjustment, is .095. Neither of these conclusions is improbable. If both are taken into account and a further adjustment is made on account of the particular character of hotel property, as discussed above, a capitalization rate of .0975 before the inclusion of a tax factor is appropriate. The addition of the effective tax rate of .0216 produces a final rate of .1191. McNemey’s net income figure of $1,834,194 capitalized at .1191 produces a value indication of $15,400,453. Lennhoffs net income figure of $2,108,314 yields a value indication of $17,702,049. These figures appear on the last line of the appended comparison chart. Since the ratios generated by these values (.9739 for McNemey and .8474 for Lennhoff) fall within the common level range, the assessment should remain undisturbed.
It bears emphasis that this decision is based upon the consideration of the reasoning and supporting data addressed in the record *536 of this ease for the particular adjustments proposed. It should not be understood as a definitive pronouncement on appraisal practices designed to extract real estate value from the assets of a business or as binding precedent with respect to adjustments of the kind proposed here, should they be offered in other cases with different records.
Judgment shall be entered affirming the assessment.
APPENDIX
[[Image here]]
A After computation of tlu$ amount, LennhofTs alternative treatments of flag value and residual intangibles arc shown in separate columns. Tlie led column shows a deduction of 4 35% of gross income to exclude both flag value and residual intangibles. The nght column shows a deduction of 15% of operating income before allowance for return of FF&E and amortization of start-up costs to exclude flag value only, with residual intangibles addressed by a 75 basis-point addition to the capitalization rate.
B Lennhoffs stated capitalization rates (.1169 and 1244) have been adjusted to incorporate the effective, rather than actual, tax rates.